## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| **FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for CHARTER BANK OF SANTA FE, NEW MEXICO,** | § § § § § | |
| **Plaintiff,** | § § | |
| **VS.** | § § | NO. _____ |
| **ROBERT WERTHEIM, R. GLENN WERTHEIM, JOHN W. BROWN, RONALD BROWN, PAUL GOBLET, JOYCE GODWIN, SHIRLEY SCOTT, BRUCE SELIGMAN, STEPHEN M. WALKER, and ANDREW FELD** | § § § § § § § § | |
| **Defendants.** | | |

## COMPLAINT FOR NEGLIGENCE, GROSS NEGLIGENCE, AND BREACHES OF FIDUCIARY DUTY

Plaintiff Federal Deposit Insurance Corporation, as Receiver for Charter Bank of Santa Fe, New Mexico ("FDIC-R"), states its Complaint against the Defendants for negligence, gross negligence, and breaches of fiduciary duty, showing the Court as follows:

## I.
## OVERVIEW

1.     The Defendants, as officers and directors of Charter Bank of Santa Fe, New Mexico ("Charter Bank" or "the Bank"), committed $50 million - 72 percent of the Bank's core capital of $69 million - to open and operate a highly risky and speculative subprime lending operation in Denver, Colorado in late 2006, when they knew or should have known that there was no secondary market for subprime loans. The Bank funded loans that no reasonable financial

institution would have made at any time, much less in 2007 and 2008 when the risks of such lending were well recognized. The Defendants negligently permitted and presided over, and failed to suspend, limit or stop the production of a portfolio of approximately $50 million in risky, subprime residential loans intended for sale into a secondary market that at the time was recognized to be increasingly unstable, unpredictable, and illiquid due to concerns about the credit quality of subprime loans.

2.      At a time when the Defendants knew that other lending institutions were attempting to reduce their risks by enforcing stricter underwriting criteria, the Defendants instead chose to relax Charter Bank's standards to an unprecedented level in order to try to grow its earnings, as opposed to raising capital to ensure the safety of the Bank. This reckless gamble did not pay off. Unable to sell more than $45 million of the subprime portfolio into an illiquid secondary market, the Bank was forced to transfer the loans into Charter Bank's investment portfolio, where most stopped performing altogether. In fact, at the time of the Bank's closing, nearly 73 percent of the subprime loans were 30 days or more delinquent.

## II.
## JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this case pursuant to 12 U.S.C. § 1819(b)(1) and (2); 12 U.S.C. § 1821(d) and (k); and 28 U.S.C. §§ 1331 and 1345.

4.      The United States District Court for the District of New Mexico is the proper venue for this action pursuant to 28 U.S.C. § 1391(b). A substantial part of the claims asserted herein occurred in this judicial district.

4783333.1
59195.2

5.      This Court has personal jurisdiction over the Defendants under N.M.S.A. § 38-1-16 because, among other things, the FDIC-R's claims arise from the Defendants transacting business, committing tortious acts, and breaching fiduciary duties in New Mexico.

**III.**
**SUMMARY OF CLAIMS**

6.      On January 22, 2006, the Office of Thrift Supervision ("OTS") closed Charter Bank, and the FDIC was appointed receiver pursuant to 12 U.S.C. § 1821(c). At that time, the FDIC-R succeeded to all the rights, titles, and privileges of Charter Bank and its stockholders, account holders, and depositors. 12 U.S.C. § 1821(d)(2)(A)(i).

7.      Collectively, the Defendants, as officers and directors of Charter Bank, were charged with, among other responsibilities, identifying and managing risks to ensure they could be managed appropriately and were suitable for the Bank. However, in late 2006, the Defendants shirked those responsibilities by recommending and/or authorizing the creation of Specialty Lending Group ("SLG"), a subprime lending division in Denver, Colorado, which originated more than $50 million of largely predatory subprime loans with no ability by the Bank to price these loans for the substantial risk that they presented.

8.      FDIC-R asserts claims against nine former directors of Charter Bank (the "Director Defendants") for negligence, gross negligence, and breaches of fiduciary duty in approving SLG and for subsequently failing to terminate the operation after it had become evident that it was going to cause large losses to the Bank. FDIC-R asserts claims of negligence, gross negligence, and breaches of fiduciary duty against two executive officers (one of whom was also a director) (the "Officer Defendants") for implementing, managing, operating, and failing to supervise SLG. (The Director Defendants and Officer Defendants are collectively

- 3 -

referred to herein as "Defendants.") The FDIC-R seeks compensatory damages and other relief as a result of the Defendants' tortious conduct (the "Damages").

9.     As described in detail below, the Defendants' negligence, gross negligence, and breaches of fiduciary duties in connection with SLG proximately caused Damages to the Bank in an amount to be proven at trial in excess of $8 million.

**IV.**
**THE PARTIES**

**A.     Plaintiff**

10.    FDIC is an instrumentality of the United States of America established under the Federal Deposit Insurance Act, 12 U.S.C. §§ 1811-1833(e). Pursuant to 12 U.S.C. §§ 1821(c) and (d)(2)(A)(i), FDIC-R is the successor to all the rights, titles, and privileges of Charter Bank and its stockholders, account holders, and depositors, including, but not limited to, the Bank's claims against its former officers and directors as set forth herein.

**B.     Defendants**

**(i)     Director Defendants**

11.    Robert Wertheim ("R. Wertheim") was the founder and Chairman of the Board of the Bank. He served as a Director of Charter Bank from 1986 until the Bank's failure.

12.    R. Glenn Wertheim ("G. Wertheim") was a Director of Charter Bank (as well as its President and Chief Executive Officer) from 1999 until the Bank failed.

13.    John W. Brown ("J. Brown") was a Director of Charter Bank from 2006 until the Bank failed.

14.    Ronald Brown ("R. Brown") was a Director of Charter Bank from 1996 until the Bank failed.

- 4 -

15.     Paul Goblet ("Goblet') was a Director of Charter Bank from 2006 until the Bank failed.

16.     Joyce Godwin ("Godwin") was a Director of Charter Bank from 1997 until the Bank failed.

17.     Shirley Scott ("Scott") was a Director of Charter Bank from 1999 until the Bank failed.

18.     Bruce Seligman ("Seligman") was a Director of Charter Bank from 1986 until the Bank failed.

19.     Stephen M. (Mike) Walker ("Walker") was a Director of Charter Bank from 2004 to January 2008.

**(ii)     Officer Defendants**

20.     G. Wertheim was the President and Chief Executive Officer (as well as a director) of the Bank from 1999 until the Bank failed.

21.     Andrew Feld ("Feld") was an Executive Vice President of the Bank from November 2006 until September 2008.

**V.**
**FACTUAL BACKGROUND**

22.     Charter Bank was founded in 1986 as a savings association headquartered in Santa Fe, New Mexico. The Bank was a wholly-owned subsidiary of Charter Companies, Inc., a single-thrift holding company, which was owned 100 percent by R. Wertheim. It operated eight branches, mostly in Albuquerque and Santa Fe, which were its primary lending areas.

A.     **Charter Bank was historically under-capitalized and over-leveraged.**

23.     The Director Defendants historically operated Charter Bank with a bare minimum of capital. Rather than raising equity, the Director Defendants chose to borrow as much as possible from the Federal Reserve and take as much of the profits out of the Bank as possible. Federal regulators repeatedly warned the Director Defendants that the Bank was over-leveraged and needed to raise more capital. The Director Defendants responded that they could operate the Bank with less capital and more borrowed money because they had placed most of their loans in the real estate acquisition, development, and construction loan business. The Director Defendants asserted that, because these loans were shorter in duration, the Bank had less risk – an analysis that failed to anticipate any real downside risk in the real estate development business.

24.     Charter Bank did not raise capital from any outside sources. Rather, the Director Defendants decided to try to grow capital through earnings. This led to the dangerous making of even more risky loans. The Director Defendants chose to ignore regulatory warnings and to recklessly chase yield by over-committing the Bank's already unreasonably low capital to open and operate the perilous SLG subprime lending program. In 2003, the Board of Directors agreed to conduct periodic reviews of risk factors that might threaten the Bank's capital position. During such a review in February 2007, the Director Defendants noted that the Bank had recently assumed additional risks in creating SLG as a channel to originate subprime loans. Even though the additional risks were noted, the Director Defendants concluded that maintaining the minimum capital amounts was appropriate.

25.     Because of the risks involved in subprime lending, the OTS recommended that institutions with subprime programs have capital ratios that were well above the averages for

their traditional peer groups. However, as stated above, Charter Bank was historically under-capitalized for its peer group. As of June 2008, the Bank had the second lowest core capital ratio in the OTS's Midwest Region.

**B.      Charter Bank negligently formed and operated SLG during a subprime crisis.**

26.      In the summer of 2006, Feld contacted G. Wertheim regarding what he perceived to be a "viable niche" in the subprime market for low loan-to-value ("LTV") loans. The Officer Defendants presented the Director Defendants with a proposal that was, on its face, imprudent, negligent, and reckless. Nonetheless, the Director Defendants approved the SLG operation and elected Feld as an executive vice president to manage and grow SLG in September 2006. On November 15, 2006, the Director Defendants approved a revised lending policy that included the SLG subprime lending policies proposed by the Officer Defendants. SLG planned to target subprime markets primarily in Florida, California, and Texas. Despite knowledge of the risks associated with the subprime market, January 2007, Charter Bank committed $50 million, 72 percent of its then $69 million in core capital, to opening and operating SLG in Denver, Colorado – a state in which Charter Bank had no presence or experience.

27.      To limit the Bank's risk, the Defendants intended that Charter Bank would sell most of the SLG subprime loans into the secondary market. In doing so, the Defendants ignored the warnings issued by regulators about the volatility of the secondary market and significant liquidity risk of originating subprime loans for sale, especially during an economic downturn when investor interest can disappear quickly. *See*, FIL20-99, *Interagency Guidance on Subprime Lending* (March 4, 1999). In fact, during the Board meeting at which the Director Defendants approved the subprime operation in September 2006, G. Wertheim

- 7 -

acknowledged that there was not enough volume to drive an efficient secondary market for the mortgages, but he recommended proceeding with the program anyway.

28.     In March 2007, soon after the SLG program began, G. Wertheim circulated an article from the *Wall Street Journal* regarding turmoil in the subprime market. Rather than viewing this as a warning, G. Wertheim noted that he thought that the growing turmoil was an "opportunity." Yet, the very first purchaser to which Charter Bank tried to sell its subprime loans backed out of the purchase after performing due diligence in April through May 2007. Charter Bank's only sale was $4 million of mortgages in June 2007, and by July 2007 Charter Bank was required to begin moving the 60-day delinquent loans from its "held for sale" portfolio to its "held for investment" portfolio because the loans could not be sold.

29.     In June 2007, the Officer Defendants recognized an impending meltdown of the subprime market. In August 2007, G. Wertheim informed the Director Defendants that there was no market for SLG's subprime loans. In September 2007, he reported that if no outlets for the loans were found, SLG would be suspended. Despite these warnings and the fact that no secondary market was ever found, the Defendants did not terminate SLG's lending for another year. In fact, Charter Bank funded $41 million in subprime loans from July 2007 through September 2008 despite repeatedly acknowledging the surmounting risk.

30.     By the end of 2007, more than 69 percent of the SLG subprime loans were more than 30 days delinquent. Undeterred, SLG boastfully advertised in August 2007: **"We are a $1.25 Billion dollar Bank . . . not even the major market changes can stop us!"** The Bank's 2008 Profit Plan envisioned an "opportunity" to become a top five national producer

- 8 -

of subprime loans. The Defendants demonstrated a blatant and reckless disregard for the inevitable losses to the Bank.

31.     Feld was terminated on September 26, 2008, and SLG was shut down on September 30, 2008. As of the end of September 2008, the Bank's subprime loan portfolio totaled $49.6 million – 56.7 percent of its core capital. By November 2009, 72.96 percent of the SLG loans were more than 30 days past due.

## C.     SLG's lending practices were negligent, grossly negligent, and predatory.

### (i)     SLG Loan Policy

32.     The subprime underwriting criteria proposed by the Officer Defendants and approved by the Director Defendants was far below the standards any reasonable bank would have employed at any time, must less during 2007 and 2008, when there was turmoil in the housing market. The policy allowed the Bank to lend to virtually anyone, including a borrower who had declared bankruptcy, gone through foreclosure, or had a history of making late mortgage payments.

33.     SLG's policy permitted loans to borrowers with credit scores as low as 400 — a score in the bottom two percent of the population and with an 87 percent statistical probability of making a payment 90 days late within two years — but with at least 35 percent equity in their homes. The policy also permitted a debt-to-income ratio as high as 55 percent based on "stated" income, as high as any subprime lender in the market. The policy permitted SLG's loans to be based on a borrower's "stated" income and "stated" assets, meaning that potential borrowers could simply "state" – rather than prove – the amount of their income. Loan officers were only required to verbally verify employment prior to closing and make a

determination that the "stated" income was reasonable for the type of employment. The loans were adjustable rate mortgage loans ("ARMs"), provided a prepayment penalty during the first two years, and, in the case of refinanced loans, permitted the borrowers to take cash out based on their credit histories (as much as $50,000 even for a borrower who was 30 to 59 days delinquent on an existing mortgage). Every loan was required to have an appraisal, and the maximum LTV was 65 percent. In October 2007, the Bank lowered the required LTV ratio limit to 60 percent, and all loans were required to have an appraisal and a broker price opinion.

34.     Bankruptcy, default on an existing mortgage, or even a pending foreclosure were not disqualifying factors to obtain a loan from SLG. Before SLG approved a loan, it required that borrowers detail the reasons for their financial distress. However, instead of helping borrowers out of their distressful situations, SLG actually compounded their problems by making loans the borrowers could not afford to repay. Moreover, fees were unusually high on the loans, resulting in the stripping of borrowers' equity in their homes.

35.     Many of the underwriter notes more resemble "cheerleading" rather than real underwriting, and the underwriters were more concerned about figuring out how to get loans approved than determining if loans were suitable risks for the Bank. In fact, the Bank compounded the risk by avoiding the legal requirements for high-risk loans imposed by Section 32 of the Home Ownership and Equity Protection Act of 1994 ("HOEPA") (triggered by an annual percentage rate in excess of the interest rate on Treasury securities of comparable maturity by more than eight percent and prohibiting a lender from making a HOEPA loan based on the collateral value of the property without regard to the borrower's ability to repay the loan). To avoid HOEPA, the Bank limited SLG loans to interest rates of no more than 11.5 to

12 percent. Given the minimum FICO score and maximum debt-to-income ratios for SLG loans based solely on stated income, these artificially capped interest rates were simply insufficient to cover the very high risk of default.

36.    SLG's criteria for evaluating the loan applicant's consumer credit profile were superficial. As a practical matter, with a minimum FICO score of 400 (the bottom two percent of the population) combined with exceptions for bankruptcy, foreclosure, and/or late payments on existing or previous mortgages meant that virtually any consumer credit profile was acceptable. In many loans, foreclosure was imminent. Yet the Bank prevented the foreclosure from occurring by consistently approving and funding new mortgage loans that refinanced the borrower's existing mortgage plus all costs, fees, and expenses associated with the previous mortgage lender's collection efforts. The proceeds from the new mortgage loan were also typically used to refinance existing consumer debt, past due property taxes, and provide some cash back to the borrower.

37.    In September 2008, the OTS examiners noted the following concerns, deficiencies, and/or high-risk factors with SLG: (1) 56 percent of the loans were in Florida; (2) the Bank provided cash-out funds to borrowers when the property was already in or near foreclosure; (3) there were a number of first payment defaults; and (4) and many loans were 60 days past due and already in foreclosure. The OTS noted that the Bank's subprime portfolio totaled 56.7 percent of the Bank's core capital and downgraded the Bank to a composite CAMELS 3 rating. In March 2009, the OTS downgraded the Bank to composite CAMELS rating of 5 and found that the performance of executive management and the oversight provided by the Board of Directors was poor and ineffective.

**(ii)     Predatory Lending**

38.     SLG's lending was based primarily on the liquidation values of the homes with "equity stripping" as a foreseeable result.  The Defendants were concerned only with the value of the collateral rather than the borrower's ability to repay. Moreover, fees on the mortgages were frequently very high, resulting in equity stripping. For example, one borrower had defaulted on his preexisting mortgage loan of $89,000, and the lender had initiated foreclosure proceedings. His monthly payment was $630. On the eve of foreclosure, SLG, gave the borrower a $120,000 ARM loan with a 30-year term interest-only for the first five years with a fixed rate of 11.85 percent for the first two years. Closing fees totaled over $12,000, which were paid by loan proceeds, thus stripping equity from the borrower. The borrower's initial monthly payment to Charter Bank was $1,187 – nearly double the prior payment that he could not pay. The borrower was unable to make the first payment and was left with $120,000 in debt rather than the prior loan of $89,000. In approving the loan, SLG had disregarded the borrower's inability to repay the much larger SLG loan – in effect basing its approval on the LTV ratio alone and relying solely on the foreclosure value of the borrower's home for debt repayment.

39.     The Defendants knew, or should have known, that as a result of its lax underwriting standards that the probability of default was enormous. In effect, the Bank was relying solely on foreclosures, without consideration of the borrower's ability or willingness to repay - classic predatory lending.  Indeed, the Office of the Comptroller General published an Advisory Letter AL 2003-2 dated February 21, 2003 that warned banks that lending based predominantly on the liquidation value of the borrower's collateral, rather than on a determination of the borrower's repayment ability, is a fundamentally unsafe and unsound

- 12 -

banking practice that not only increases the risk to the bank that the loan will default but may also increase the bank's potential loss exposure upon default. The defendants ignored this warning.

40.     The Defendants knew or should have known that SLG's lending practices were predatory. In June 2007 the Bank's Audit Committee determined that SLG's lending practices raised concerns under the applicable regulatory guidance, including TB 72a (Capital Requirement for High LTV Mortgage Loans), 2001 Interagency Expanded Guidance of Subprime Lending Programs, and 2007 Proposed Statement on Subprime Mortgage Lending. The audit report identified regulatory red flags to predatory lending and assessed the Bank's risk potential under each. The audit report classified several of SLG's subprime loan policies as possible red flags to predatory lending practices. The Audit Committee ranked SLG as high risk for the following red flags:  (1) loan evaluated based on borrower ability to repay vs. collateral value; (2) loan payments do not include tax and interest escrow; (3) ARM; (4) prepayment penalty; and (5) borrower in minority/protected class. The Committee ranked Charter as medium risk for: (1) deceptive information and (2) excessive fees.

    **(iii)     SLG's Targeted Lending Areas**

41.     Charter Bank's business plan for SLG was dependent on borrowers having sufficient equity in their homes to make foreclosure profitable. However, the equity buffer quickly evaporated in a large number of instances because SLG was lending into areas that were experiencing rapid price erosion. For example, by July 2007, the real estate market in Florida was in steep decline. Nonetheless, SLG made 82 percent of its loans in that market between July 2007 and July 2008. In January 2008, R. Wertheim told the Defendants that because of the

- 13 -

national subprime situation, housing was no longer viewed as excellent loan collateral in the market. Despite the express knowledge of the declining value of the collateral, the Bank went on to fund approximately $14 million in additional subprime loans in high-risk areas.

42.     When the Defendants proposed and approved SLG, they were aware or should have been aware of the falling housing markets. First, New Mexico itself was hit hard in 2006 when approximately 11 percent of its subprime loans were reported to be delinquent. Second, the burgeoning foreclosures in SLG's target subprime markets – Florida and California – were the subject of widely reported national news coverage. By September 2006, for instance, CNN Money reported a surge of foreclosures. California and Florida reportedly were the hardest hit. In 2007, Florida and California were among the top 10 states with the most foreclosures. The Defendants failed to consider or ignored this data and other publicly available information relative to the falling real estate market when approving the Bank's loan policy in Florida and California.

**D.     SLG presented unreasonable risks to Charter Bank.**

43.     When the Defendants recommended and/or approved the SLG program on September 27, 2006, they committed $50 million or 72 percent of the Bank's core capital of $69 million to SLG. The Defendants' decision to recommend and/or commit most of the Bank's core capital to an unsafe and unsound, highly risky, and ill-thought-out subprime mortgage loan program with all of the risks described previously breached the Defendants fiduciary duties to the Bank and was negligent, grossly negligent, and even reckless. The commitment disregarded the regulatory guidance cited above and the Expanded Guidance for Subprime Lending Programs issued jointly by the banking regulatory agencies in 2001, which stressed that "[l]oans to

- 14 -

borrowers who do not demonstrate the capacity to repay the loan, as structured, from sources other than the collateral pledged are generally considered unsafe and unsound" for any institution that has subprime lending operations with an aggregate credit exposure greater than or equal to 25 percent of Tier 1 capital. *See,* FIL-9-2001, *Expanded Guidance for Subprime Lending Programs* (Jan. 31, 2001). As a result of the Defendants' conduct, the Bank suffered substantial losses.

44.     Shortly after SLG started originating loans, the loans began to default at a rapid rate. Many borrowers never made the first payment, and loans were transferred to the Bank's held-for-investment portfolio where Charter Bank ultimately recognized significant losses. By the end of 2008, nearly 55 percent ($22 million) of the SLG loans were delinquent and 45 percent ($18 million) were in foreclosure. As of October 2009, more than 72 percent of the SLG loans were more than 30 days delinquent and approximately 70 percent were on nonaccural. As of November 2009, most of the SLG loans were classified as substandard and the Bank recorded a loss of $8.1 million.

## VI.
## CAUSES OF ACTION

### COUNT 1:  NEGLIGENCE

45.     FDIC-R re-alleges and incorporates by reference each of the allegations in paragraphs 1-44 of this Complaint as if fully set forth herein.

46.     Each of the Defendants owed Charter Bank a duty of care to exercise the diligence, care, and skill that ordinarily prudent persons would exercise under similar circumstances in like position. Each Defendant agreed and was obligated by statute, contract,

and/or common law to diligently and honestly administer the affairs of the Bank, and was under a duty to ensure that the Bank operated in compliance with all laws, rules, and regulations, as well as all applicable rules and regulations of the Bank. The Defendants, collectively and individually, owed to the Bank the highest duty of due care and diligence in the management and administration of the affairs of the Bank, in the use and preservation of its assets and property, and in the adoption and carrying out of banking practices that were safe, sound, and prudent.

A.      **Negligence Claims Against the Director Defendants**

47.     Defendants G. Wertheim, R. Wertheim, J. Brown, R. Brown, Goblet, Godwin, Scott, Seligman, and Walker, as directors of the Charter Bank, were responsible for the overall supervision and direction of the affairs of the Bank. It was their duty to the Bank: (a) to use ordinary diligence in ascertaining the condition of the Bank's business and to exercise reasonable control and supervision of the Bank's officers; (b) to ensure that the Bank's lending policies, banking regulations, prudent loan underwriting and credit administration practices were followed; (c) to take reasonably prudent steps to ensure that the Bank did not make imprudent loans; and (d) to exercise the ordinary care and diligence in the administration of the affairs of the Bank.

48.     Each of the Director Defendants breached their duties and were negligent by, among other things: (a) voting to approve the creation of SLG; (b) approving a subprime loan policy that enabled SLG to originate subprime loans without proper controls; (c) failing to properly inform themselves about the proposed subprime loan policy and the risks posed to the Bank; (d) failing to exercise independent judgment in connection with the approval of SLG; (e) failing to ensure that the Bank's lending complied with banking statutes and regulations and

- 16 -

with prudent and sound lending practices; (f) recklessly permitting the pursuit of a high-risk stratagem on a predatory subprime lending program; (g) continuing to expose the Bank to undue risk by originating loans that could not be sold in the secondary market and that were certain to default at an extraordinary rate; (h) ignoring regulator's warnings regarding the Bank's need to increase capital and continued to operate the unreasonably risky SLG operation while severely under-capitalized; (i) failing to terminate SLG for more than a year, funding an additional $34 million of subprime loans, after G. Wertheim reported to the Director Defendants that there was no market for the subprime business and stated that SLG would be suspended if no outlets were found; and (j) failing to supervise the Bank's lending function properly by terminating SLG earlier than September 20, 2008, after it had become clear that the program presented substantial and unmanageable risk to the Bank.

49.    The Director Defendants are not entitled to the application of the business judgment rule because each of the Director Defendant's actions or inactions that are the basis of this negligence claim were not made in good faith and without the Director Defendants being reasonably well-informed.

50.    Each Director Defendant's negligence was a direct and proximate result of damages to the Bank in an amount to be determined at trial.

**B.    <u>Negligence Claims Against the Officer Defendants</u>**

51.    Defendant G. Wertheim, as President and CEO, among other duties, was responsible for the overall management of the Bank including, without limitation, all facets of the Bank's lending and was obligated to exercise the degree of diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in

- 17 -

management, oversight, and conduct of the Bank's lending function. These duties included, but were not limited to, ensuring: that the Bank had adequate policies, procedures, and internal controls relating to, among other things, subprime lending; that the Bank complied with banking statutes/regulations; that the Bank did not make imprudent loans as part of a plan to unreasonably grow the Bank; that the Bank approved loans that complied with prudent and sound lending practices.

52.     G. Wertheim breached his duties and was negligent by, among other things, (a) permitting and presiding over SLG's generation of residential loans for resale into a secondary market when he knew the secondary market was uncertain and volatile as to interest in the purchase of such loans; (b) failing to ensure that the SLG loans were underwritten in a safe and sound manner; (c) failing to suspend SLG well after he knew or should have known that significant losses to the Bank were imminent; (d) continuing to generate subprime loan production at substantial levels well into 2008 while ignoring regulatory warnings and deteriorating market conditions related to subprime lending.

53.     Defendant Feld, as executive vice president in charge of SLG, was responsible for creating, organizing, managing, and growing all aspects of the Banks' "new residential hard money wholesale division." It was Feld's responsibility to maintain a current awareness and understanding of national and local market conditions and of applicable banking laws, regulations, internal Bank policies and procedures, and to comply fully with those laws, regulations, policies and procedures. In addition, he was responsible for holding SLG employees accountable for such compliance. He was obligated to exercise a degree of

- 18 -

diligence, care, and skill that ordinarily prudent persons in like positions would exercise under similar circumstances in management, oversight, and conduct of the Bank's lending activities.

54.     Defendant Feld breached his duties and was negligent by, among other things: (a) recommending the creation of SLG in a rapidly declining market; (b) failing to fully report the risks of SLG to Bank management and the Board of Directors; (c) failing to supervise the SLG operations, including failure to ensure compliance with all laws and regulations; (d) failing to recommend the SLG be suspended well after he knew or should have known that significant losses to the Bank were imminent; and (e) making or supervising the making of poorly underwritten SLG loans.

55.     By their actions and inactions, as described specifically and generally herein, the Officer Defendants repeatedly failed and neglected to perform their respective duties with due care and diligence and took actions and made decisions without being reasonably informed and without regard to the risks, constituting breaches of their duties of care.

56.     To the extent the business judgment rule applies to officers, which FDIC-R contends it does not, the Officer Defendants are not entitled to the application of the business judgment rule because each of the Officer Defendant's actions or inactions that are the basis of this negligence claim were not made in good faith and without the Officer Defendants being reasonably well-informed.

57.     Each Officer Defendant's negligence was a direct and proximate result of damages to the Bank in an amount to be determined at trial.

<u>COUNT 2:  GROSS NEGLIGENCE</u>

58.     FDIC-R re-alleges and incorporates by reference each of the allegation in paragraphs 1-57 of this Complaint as if fully set forth herein.

59.     Section 1281(k) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1281(k), holds directors and officers of financial institutions personally liable for loss or damage to the institution cause by their "gross negligence," as defined by state law. As officers and directors of Charter Bank, the Defendants had a duty to properly supervise, manage, and oversee the lending operations and business affairs of the Bank and to conduct its business consistent with safe and sound lending practices.

**A.**     **<u>Gross Negligence Claims Against Director Defendants</u>**

60.     As described above, each of the Director Defendants was grossly negligent by, among other things: (a) repeatedly ignoring regulators' warnings regarding the Bank's need to increase capital and continuing to operate the unreasonably risky SLG operation while severely under-capitalized; (b) continuing to expose the Bank to undue risk by originating loans outside the Bank's normal trade area, and that could not be sold in the secondary market and that were certain to default at an extraordinary rate; (c) failing to terminate SLG for more than a year and funding an additional $34 million of subprime loans, after G. Wertheim reported Defendants that there was no market for the subprime business and stated that SLG would be suspended if no outlets were found; and (d) approving in the first place what was essentially a predatory lending scheme with reckless underwriting standards.

61.     Each Director Defendant's gross negligence was a direct and proximate result of damages to the Bank in an amount to be determined at trial.

4783333.1
59195.2

**B.**     <u>Gross Negligence Claims Against Officer Defendants</u>

62.      As described above, each of the Officer Defendants was grossly negligently by, among other things: (a) proposing what was essentially a predatory lending scheme with reckless underwriting standards; (b) repeatedly ignoring regulators' warnings and continuing to operate the unreasonably risky SLG operation while severely under-capitalized; (c) continuing to expose the Bank to undue risk by originating loans outside the Bank's normal trade area, and that could not be sold in the secondary market and that were certain to default at an extraordinary rate; (d) failing to recommend that SLG be terminated for more than a year and funding an additional $34 million of subprime loans, after G. Wertheim reported Defendants that there was no market for the subprime business and stated that SLG would be suspended if no outlets were found.

63.      Each Officer Defendant's gross negligence was a direct and proximate result of damages to the Bank in an amount to be determined at trial.

**COUNT 3: BREACH OF FIDUCIARY DUTIES**
**(as to all Defendants)**

64.      FDIC-R re-alleges and incorporates by reference each of the allegations in paragraphs 1-63 of this Complaint as if fully set forth herein.

65.      Directors and officers have a fiduciary duty to the corporation, including the duties of loyalty, good faith, inherent fairness, and the obligation not to profit at the expense of the corporation. Directors are obligated to exercise their duties in good faith and in a manner the director believes to be in or not opposed to the best interests of the corporation.

66.      By their actions and inactions, as specifically described herein, each of the Defendants abused their discretion and/or acted without good faith in the performance of their respective duties as officers and/or directors of Charter Bank, constituting breaches of their

- 21 -

fiduciary duties owed to the Bank by, among other things: (a) voting to approve SLG and the subprime loan policy; and (b) by failing to effectively manage the lending function of the Bank by failing to timely close SLG.

67.     Each Defendant's breach of fiduciary duty was a direct and proximate result of damages to the Bank in an amount to be determined at trial.

## VII.
## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, the FDIC as Receiver for Charter Bank, Santa Fe, New Mexico, requests entry of judgment in its favor against Defendants as follows:

    A.    For compensatory damages of at least $8 million, and any excess amount as may be proved at trial;

    B.    For its costs of suit against all Defendants;

    C.    For prejudgment interest; and

    D.    Such other and further relief as the Court deems just and proper.

## VIII.
## JURY DEMAND

FDIC-R REQUESTS A TRIAL BY JURY.

4783333.1
59195.2

Dated:  January 17, 2013

Respectfully submitted,


By: _/s/ Stephen W. Lemmon_____
    Stephen W. Lemmon (NM Bar No. 13-3)
    Adam I. Hauser (NM Bar No. 13-4)
    Rhonda B. Mates (NM Bar No. 13-5)

    BROWN McCARROLL, L.L.P.
    111 Congress Avenue, Suite 1400
    Austin, Texas 78701
    (512) 472-5456
    (512) 479-1101 (fax)
    slemmon@brownmccarroll.com
    ahauser@brownmccarroll.com
    rmates@brownmccarroll.com

    **Attorneys for Plaintiff Federal Deposit Insurance Corporation, as Receiver for Charter Bank of Santa Fe, New Mexico**